Scot A. Boyd (9503)
scot.boyd@chrisjen.com
Stephen D. Kelson (8458)
Stephen.kelson@chrisjen.com
Phillip E. Lowry (6603)
phil.lowry@chrisjen.com
Christensen and Jensen
257 East 200 South, Suite 1100,
Salt Lake City, Utah 84111
*Attorneys for Relator*

**IN THE UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Ex. rel. Mark Christopher Tracy,<br><br>Plaintiff,<br><br>vs.<br><br>EMIGRATION IMPROVEMENT DISTRICT, a Utah Special Service District; CAROLLO ENGINEERS Inc., a California professional corporation; AQUA ENVIRONMENTAL SERVICES, INC., a Utah corporation; R. STEVE CREAMER, an individual; FRED A. SMOLKA, an individual; MICHAEL HUGHES, an individual; MARK STEVENS, an individual; DAVID BRADFORD, an individual; LYNN HALES, an individual; ERIC HAWKES, an individual and DOES 1-112,<br><br>Defendants. | **FIRST AMENDED COMPLAINT PURSUANT TO FALSE CLAIMS ACT**<br><br>**FILED PURSUANT TO 31. U.S.C. §3730(b)(2) UNDER SEAL**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No.: 2:14-cv-00701<br><br>Judge: Clark Waddoups<br><br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER** |

The United States of America, by and through qui tam relator Mark Christopher Tracy ("***Relator***"), brings this action under 31 U.S.C. §3729, et seq., as amended ("***False Claims Act***") to recover all damages, penalties and other remedies established by the False Claims Act on behalf of the United States to include disgorgement of any private profits.

Plaintiff, by and through counsel, complain and allege against Defendants as follows:

## I. INTRODUCTION

Located within 20 minutes of downtown Salt Lake City in a pristine mountain setting, Emigration Canyon (the "***Canyon***") is one of the most attractive areas for residential building development in the State of Utah. However, as with any potential for high-value profit, property investment within the Canyon poses great financial risk.

For instance, apart from the political resistance of Canyon residents opposed to any type of new development, a potential investor faces the most grievous of financial risk – the burden of bringing water service to any new home within the Canyon. To illustrate, even if an investor acquires sufficient water rights necessary to legally draw water from the Canyon aquifer, and even if an investor spends millions of dollars constructing a water-system infrastructure, the greatest risk to investment could never be adequately calculated or overcome – every new well and every new water system is legally inferior to every existing private water-right previously established by an existing well located within the Canyon. As such, a multi-million dollar, land-development investment is subject to total loss if one, single private well supplying water to the most basic, shanty-like shack dried up and the homeowner brings legal action.

Upon information and belief, between January 1, 1998 and March 7, 2002, the below named Defendants entered into agreements in order to acquire and divert federally-backed funds for private profit in perhaps one of the most perpetual and lucrative water grabs in the history of the State of Utah. Since the inception of these agreements, numerous John Does may have joined in, benefited from and/or allowed these fraudulent activities to occur.

## II. PRELIMINARY STATEMENT

1. This is an action to recover damages and civil penalties on behalf of the United States of America, for violations of the False Claims Act arising out of (a) the fraudulent acquisition of public funds dispersed under federally-backed bond purchase agreements to complete a civilian water project, (b) the diversion of the aforementioned federally-backed funds, (c) the failure to report improper disposal of waste at a federally-funded building site, (d) the failure to report the improper disposal of waste in a federally-protected stream, (e) the failure to report bacterial contamination of drinking water, (f) the failure to report discharge of contaminated water, and (g) the failure to report the retirement and impairment of superior property rights to a clean, safe water supply in violation of the Clean Water Act.
2. The False Claims Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000.00 for each such claim, plus three times the amount of the damages sustained by the Government.
3. The False Claims Act allows (a) any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery, and (b) if an entity is under a contractual obligation to the federal government not to violate federal environmental standards, under the legal doctrine of "reverse qui tam," any failure to report the same will result in a shared recovery for any person bringing such a violation to the attention of the responsible federal agency. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.
4. On behalf of the United States, Relator seeks treble damages and penalties for each false claim, each false statement and each failure to report environmental violations as well as each failure to report contamination of drinking water to include each failure to report the discharge of contaminated water as well as failure to report the willful retirement and

impairment of superior rights to clean and safe water as provided under the False Claims Act to include the disgorgement of any unlawful profits.

5. Relator is informed and believes that no official of the United States charged with responsibility to act in the circumstances set forth herein learned of the facts underlying this complaint more than three years prior to filing this action.

## III. PARTIES

6. Relator is a resident of Salt Lake County, State of Utah.

7. Relator is informed and believes that Defendant Emigration Improvement District ("***EID***") is a special service district organized under the laws of the State of Utah, endowed with governmental authority to provide water and sewage service to residents of Emigration Canyon located within Salt Lake County, Utah. EID's headquarters are located within Salt Lake County, State of Utah.

8. Relator is informed and believes that Defendant Carollo Engineers Inc. ("***Carollo Engineers***") is a California professional corporation headquartered in Walnut Creek, State of California.

9. Relator is informed and believes that Defendant Aqua Environmental Services, Inc. ("***Aqua***") is a corporation organized and existing under the law of the State of Utah, with its headquarters located within Davis County, State of Utah.

10. Relator is informed and believes that Defendant R. Steve Creamer ("***Creamer***") is the former CEO of Energy Solutions and a current consultant of EID, is the current President of the Emigration Oaks Property Owners Association, Inc., and is a resident of Salt Lake County, State of Utah.

11. Relator is informed and believes that Defendant Fred Smolka ("***Smolka***") is the former Manager/Election Specialist and current Treasurer and consultant of EID, former member of the EID Engineering, Finance and Audit Committee, was appointed to serve as the Chairman of the Emigration Township Planning Commission ("***ETPC***") in 2014, and is a resident of Salt Lake County, State of Utah.

12. Relator is informed and believes that Defendant Michael Hughes ("***Hughes***") is the current Chairman and Trustee of EID, was elected to that position prior to January 2000, and is a resident of Salt Lake County, State of Utah.

13. Relator is informed and believes that Defendant Mark Stevens ("***Stevens***") is the current Co-Chairman and Trustee of EID, was elected to that position in November 2005, is member of the EID Audit Committee, and is a resident of Salt Lake County, State of Utah.

14. Relator is informed and believes that Defendant David Bradford ("***Bradford***") is a current Trustee of EID, was elected to that position in November 2007, is a former member of the EID Finance Committee, and is a resident of Salt Lake County, State of Utah.

15. Relator is informed and believes that Defendant Lynn Hales ("***Hales***") is the former Chairman and Trustee of EID, was elected to that position sometime prior to January 2000, is the current Chairman of the EID Engineering Committee, and is a resident of Salt Lake County, State of Utah.

16. Relator is informed and believes that Defendant Eric Hawkes (**"*Hawkes***") is the current General Manager of EID and is a resident of Salt Lake County, State of Utah.

## IV. JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

18. Relator is informed and believes that there have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. §3730(e).

19. This Court is the proper venue for this action pursuant to 31 U.S.C. §3732(a), because at least one of the Defendants resides in this federal district (see paragraphs 7-16).

20. This Court has personal jurisdiction over all Defendants, because each is a resident of this district, or has its headquarters in this district, or conducts substantial business within this district (see paragraphs 7-16).

## V. FACTUAL BACKGROUND

21. Defendant EID is a "Special Service District," created in 1968 by the Salt Lake County Council for the singular purpose of providing water and sewage service to the current residents of the Canyon.
22. EID's charter does not grant it governmental authority to enhance or hinder building development in the Canyon.
23. EID does not fall within the authority of the Utah Public Utilities Commission.
24. Since 1985, EID has collected property tax revenue for all real properties located within the Canyon.
25. To date, EID provides no water or sewage service in the areas of the Canyon known as Lower Emigration Canyon, Emigration Place, Badger Hallow and Upper Pinecrest Canyon.
26. In a bond election on November 1995, Canyon residents rejected an EID proposal to construct a canyon-wide drinking water system.
27. Prior to 1998, EID did not own or operate any drinking water or sewage systems.
28. On September 9, 2000, EID confirmed (a) not to interfere with existing water systems, (b) to limit the connection to any water system and payment to connect to that system to those people who want to voluntarily connect, (c) not to allow that system to accommodate connections that will cause demand on the canyon's water resources in excess of 700 equivalent residential units, and (d) to present incentives for the system to protect the canyon's streams and enhance the environment.
29. Under current building regulations of Salt Lake County, any new home constructed within the Canyon must be within 600 feet of a fire hydrant.
30. A domestic unit of 0.45 acre feet of water rights is needed for one (1) family residence in the Canyon as mandated by the Utah State Engineer's Office.
31. The enormous cost of extending 8-inch water supply lines from the existing water system has rendered most new building projects within the Canyon unfeasible.

32. Since March 18, 2003 EID began a program to buy superior water rights from Canyon residents "in an attempt to get as much paper water off the stream as possible" as recorded in the meeting minutes on the aforementioned date.
33. To date, most undeveloped properties within the EID's water service area are zoned as "FR-20" thereby requiring 20 acres of land for a single new residence.
34. To date, all changes to current zoning laws within the Canyon fall within the final authority of the Salt Lake County Council and Mayor.
35. On June 4, 2014 EID purported that it was providing water service to only 273 homes within the Canyon.
36. To date, EID reports to service 233 homes within the Canyon with its current water rights to the Utah State Engineer's Office.
37. With 677 United States postal mailboxes in the Canyon to date, EID provides water service to less than 40% of the households, while every developed and vacant property owner is taxed at the highest rate allowed by the State of Utah since 2007.
38. Relator is informed and believes there are currently 1,526 parceled properties located within the Canyon.
39. In 2001, the Emigration Canyon Community Counsel ("***ECCC***") and the ETPC under Smolka approved "down-zoning" a single 80-acre parcel now owned by Creamer.
40. Since 2002, the ECCC and the ETPC have attempted to down-zone all undeveloped property located within the Canyon without success.
41. In a conversation with a Canyon resident on December 7, 2014, Rick Raile, the Chairman of the ECCC, stated that he "had heard a rumor" that Smolka was attempting to develop **710** new residential lots within the Canyon.
42. Despite the knowledge of this "rumor", in December 2014, Raile announced new legislation under the Community Preservation Act (SB-216) which will allow the Emigration Canyon Township to become an "Enhanced Township" controlled by three to six elected officials

43. When asked by a Canyon resident in December 2014 as to the timing of the proposed "Enhanced Township" and the recent completion of the Upper Twin Creek Well at a cost of $2,069,000.00, Raile stated that there "was no water in Emigration Canyon," and any zoning changes would have "no affect" on any future development within the Canyon.

44. On March 13, 2015, SB-199 was passed by the Utah State Legislature. If signed into law by Governor Herbert, the Canyon will become either a "City" or a "Metro Township" as determined by the Canyon residents in the November 2015 elections.

45. In either scenario, Salt Lake County will no longer have authority over zoning changes within the Canyon after November 2016.

## VI. GENERAL ALLEGATIONS

46. After having been thwarted in the November 1995 water-bond election, between January 1, 1998 and March 7, 2002, upon information and belief, Creamer and EID, through Smolka, Hughes and Hales, devised a plan to nullify the aforementioned risk to land development without limiting the high-yield profit. Instead of a private company or individual assuming the risk of water-right litigation, EID, a Utah Special Water District, controlled by Smolka, Hughes and Hales would acquire federally-backed funds to construct a water-system infrastructure for the benefit of Creamer, EID, Larry, Catherine, Siv and Charles Gillmor (***Gillmor(s)***") and David Nuescheler ("***Nueschleler***") and then use public funds to either retire or supersede superior water rights. The Defendants structured the plan as follows:

47. During the late 1980's, Boyer Company ("***Boyer Co.***") created the Emigration Oaks development located on the north side of the Canyon.

48. Subdivided into approximately 235 residential lots directly above Emigration Canyon Creek, Boyer Co. had acquired 94.04 acre feet of water rights from Mt. Olivet Cemetery located near the University of Utah (57-8865) and changed the point of diversion of those surface water rights up the Canyon, thereby risking the impairment of existing water rights.

49. Although it possessed inferior water rights relative to existing households within the Canyon, Boyer Co. constructed 3 large commercial wells and a 300,000 gallon gravity-fed system at

the highest elevation within the Emigration Oaks development ("***Boyer Wells #1, #2 and #3***").

50. By 1998, 105 homes had been constructed, and Boyer Co. was obligated to supply water to another 130 vacant properties it had sold as "buildable" to private individuals.

51. With the positive knowledge that its water system was insufficient for even its current needs, Boyer Co. knew that its entire Emigration Oaks investment was at risk, because each new household drawing water at a higher elevation was inferior to every private well located on the main-canyon road.

52. With the Boyer Co. eager to avoid water-right litigation, it is believed that Defendants EID, Creamer, Smolka, Hughes and Hales entered into the following agreements, and Defendants Stevens and Bradford later entered into and perpetuated the agreements when they were elected to the EID Board of Trustees on November 7, 2005 and November 7, 2007 respectively.

53. Relator is informed and believes that Defendants Carollo Engineers, Aqua and John Does entered into and perpetuated the agreements as follows.

## VII. AGREEMENTS TO ACQUIRE AND DIVERT FEDERALLY-BACKED FUNDS

54. Sometime in 1998, EID agreed (i) to assume ownership of the Boyer Co.'s water system to include Boyer's obligation to provide water service to an additional 130 vacant lots as a "gift" and, in return, (ii) Boyer Co. "gifted" EID 300 acres of prime-developable land belonging to Boyer Co. ("***Boyer Agreement***").

55. In 2001, Smolka stepped down as EID Trustee Chairman and assumed the position of "General Manager."

56. The position of General Manager was not publically announced and no other application for the position was accepted or received by EID.

57. With control of over 300 acres of prime, developable land, upon information and belief sometime prior to June 14, 2000, EID through Smolka, Hughes and Hales agreed with landowner Creamer that Creamer would acquire 130 acres from Gillmor(s) to the immediate

east of Emigration Oaks and then EID would construct a large commercial well and a reservoir tank with federally-backed funds on the same in order to provide water service to the 560 acres collectively owned and controlled by EID and Creamer (the ***"Creamer Agreement***").

58. Upon information and belief, in exchange for the aforementioned sale of land by Gillmor(s) to Creamer, EID through Smolka, Hughes and Hales, agreed to bring water service to over 170 acres of prime, developable real property belonging to or later acquired by Gillmor(s) (the ***"Gillmor Agreement"***) above the community known as Spring Glen (aka Skycrest) also located in the Canyon.

59. In exchange for the aforementioned sale of property to Creamer, Gillmor(s) agreed to sell 59 acres of prime, developable real estate to Nuescheler in the area known as "Little Mountain" also located in the Canyon (the "***Nuescheler Agreement***").

60. Upon information and belief, in return for unknown consideration by Creamer, Gillmor(s) and/or Nuescheler, EID through Smolka, Hughes, Hales, Bradford and Stevens, thereby agreed to increase the commercial value of property owned by Creamer, EID, Gillmor(s) and Nuescheler by (a) obtaining and diverting public money in order to construct a water-system infrastructure for the private profit of Creamer, Gillmor(s) and Nuescheler; (b) misusing its status as a governmental body to acquire superior water rights from Canyon residents for the sole benefit of Creamer, EID, Gillmor(s) and Nuescheler; (c) securing favorable zoning changes through the ECCC, the ETPC, or the future "Metro Township of Emigration Canyon" for the sole benefit of Creamer, EID, Gillmor(s) and Nuescheler; (d) hindering other real estate developers from accessing water service provided by EID for the sole benefit of Creamer, EID, Gillmor(s) and Nuescheler; (e) hindering current residents on private wells from connecting to the EID water system once operational for the sole benefit of Creamer, EID, Gillmor(s) and Nuescheler; (f) and displacing low-income residents from Emigration Canyon by means of predatory water usage rates, excessive water fees and inflated property taxes (the "***EID Agreement***")

61. In order to secure legal access to the Canyon's water for the planned, massive building development, EID and Barnett Intermountain Water Consulting ("***BIWC***") agreed to find and secure additional water-right shares for the sole benefit of EID, Creamer, Gillmor(s), and Nuescheler (the ***"BIWC Agreement***") **(**collectively the "***Agreements***").

## VIII. FIRST CAUSE OF ACTION UNDER 31 U.S.C. §3729(A)(1) – FRAUDULENT ACQUISITION OF FEDERALLY-BACKED FUNDS

(False Claim Act – Presentation of False Claims)

(31 U.S.C. § 3729 (a)(1))

62. Relator incorporates herein each of the allegations set forth above.

63. Having inferior water rights, and in furtherance of the Agreements to acquire federally-backed funds and in furtherance of the **Creamer Agreement**, the following occurred:

   a. On January 3, 2001, EID secured a commitment of funds from the Utah Division of Drinking Water (***"DDW")*** for the sale of federally-backed bonds at 2.01% in the amount of $1,256,000.00 ("***2005 Bond Agreement***");

   b. On May 15, 2003, DDW confirmed that EID had requested three amendments to the aforementioned agreement thereby increasing the bond agreement to $1,846,000.00;

   c. The 2005 Bond Agreement provided that the federally-backed funds were to be used to construct a 1 million-gallon reservoir tank on property belonging to Salt Lake City on the east side of Emigration Oaks and ancillary water-supply lines for the purported benefit of **57** households on both the east and west side of the Emigration Oaks water system;

   d. Under the express terms of the commitment of funds correspondence dated January 3, 2001, the federally-backed funds were to be administered by the DDW as follows:

      i. 6 "actual payments" of federally-backed funds were to be repaid under a 30-year plan at 2.02 % by EID selling its bonds to DDW;

      ii. Under page 3, paragraph 4, DDW was obligated to purchase said bonds issued by EID only upon the fulfillment of 18 specific requirements;

iii. Under requirement Nr. 12 of the aforementioned commitment of funds, EID agreed to comply with all listed "cross-cutting Federal authorities to include Section 13 of the Federal Water Pollution Control Amendments of 1972 (the "Clean Water Act")";

iv. Under stipulation Nr. 14 of the aforementioned commitment of funds, 85% of the existing 67 "**households**" within the extended service area were to execute firm-commitment contracts to connect to the extended water-system once operational;

v. If EID was found non-compliant with any of the 18 requirements before bond closing on May 3, 2005, all federally-backed monies would be immediately recovered; and

vi. The final closing of the bond sale occurred on May 3, 2005.

e. EID recorded no meeting minutes between May 2001 and March 2002;

f. On November 16, 2001, Creamer agreed to purchase 135 acres of prime, developable property on the east side of Emigration Oaks from Larry, Siv and Charles Gillmor directly south-west of the Salt Lake City property listed in paragraph 63 (c).

g. On December 14, 2001, Creamer and EID concluded an agreement under which EID was to place a large commercial well (Brigham Fork Well) on the aforementioned property previously owned by Gillmor(s) in exchange for payments to Creamer in the amount of $78,000.00 despite the fact that (i) no hydrologic study or data supported such a well placement, and (ii) the hydrological master plan completed early that same year for EID by BIWC through Jack Barnett and Don Barnett, provided for a well site 1 mile from the contracted site.

h. In order to coerce **57** households to agree to connect to the expanded water system once operational, EID, through Smolka, Hales, Hughes, Carollo Engineers, and BIWC made the following false and misleading statements **to Canyon residents** between November 2001 and May 2005 including but not limited to:

i. EID possessed superior water rights to those of existing homes on private wells (Smolka to numerous Canyon residents known personally by Relator);

ii. It was "impossible" for EID to transfer water rights from Salt Lake Valley to the Canyon (Hales, Public Hearing on March 7, 2002);

iii. The primary purpose of the construction of the 1-million-gallon reservoir was for "fire protection" (*Id.*, Smolka, Trustee Meeting on March 18, 2002);

iv. While the planned size of the tank at 1-million gallons was excessive, it was the best decision based on "the economies of scale" and not for future development (Hughes, Trustee Meeting on March 18, 2002);

v. If smaller wells were replaced by one larger commercial well, impact on the canyon "aquifer" would be the same (EID through BIWC, Public Hearing on March 7, 2002);

vi. Private wells might "go bad" or "dry up" in the future, and if the homeowner did not sign a "firm commitment contract," or at least a "stand-by agreement," the home would be without water thereby failing to explain water-priority rights (Smolka to a Canyon resident personally known by the Relator on or about August, 2003);

vii. For residents who signed a "stand-by agreement," payment in the amount of $500.00 was necessary in order to purchase a special "water connection hub" even though no such hub was installed nor does it exist (Smolka to a Canyon resident personally known by the Relator on or about August, 2003);

viii. If a resident refused to participate in the water system, EID would encumber title thereto, so that any future owner would be unable to connect to the EID water system in the future thereby decreasing the resale and appraised value of the home (reported by Canyon resident to DDW in a correspondence from June 10, 2002);

ix. If a resident failed to execute a firm commitment contract and render payment for $500.00 before June 30, 2002, EID would encumber the property and thereby prevent future access to water service (letter Smolka to Canyon resident on June 1, 2002);

x. Those property owners unwilling to sign either a "firm-commitment contract" or a "stand-by agreement" would not be required to pay for the system expansion and maintenance because it was "entirely voluntary (Smolka to numerous Canyon residents between 2001 and 2004, Public Hearing on March 7, 2002);

xi. The proposed system would not increase future development in Emigration Canyon due to the fact that current zoning restrictions controlled development in the Canyon and not access to a readily available water system (Hughes, *Id.)*; and

xii. EID would not take any action which would "accommodate connections that will cause demand on the canyon's resources in excess of 700 equivalent residential units" (Trustee Meeting on September 15, 2000).

i. Individual statements made by the aforementioned Defendants on behalf of EID were contradictory, inconsistent and varied greatly dependant on the individual recipient's outward appearance of age, sex, marital status, financial stability and educational level whereby the most vulnerable Canyon residents were especially susceptible to excessive demands.

j. In order to appear to have fulfilled the requirements of the 2005 Bond Agreement, EID through Smolka, Hughes, Hales and BIWC, through Jack Barnettt and Don Barnett as well as Carollo Engineers made the following false and misleading statements on behalf of EID **to the Government** at the time of the bond closing on May 3, 2005 including but not limited to:

i. In order to obtain **57** executed "firm commitment contracts" and **57** negotiable instruments as required under the Nr. 14 of the 2005 Bond Agreement in order to forego the necessity of another bond election, Smolka executed two contracts with each resident wishing to "go on stand-by": (i) although the language on the contract clearly indicated an unconditional obligation to connect to the water system once operational, Smolka amended the agreement by handwriting the word "**STANDBY**" thereon and (ii) on a second exact replica of the aforementioned contract, Smolka omitted the handwritten amendment believed to have been presented to the Government;

ii. Other than the aforementioned handwritten amendment by Smolka, the "stand-by" and "firm commitment contracts" were identical;

iii. In order to obtain a negotiable instrument for $500.00 as required by the Nr. 14 of the 2005 Bond Agreement, Smolka informed Canyon residents between September 2001 and May 2005 that a special "water connection hub" would have to be purchased by the property owner, however, no such water connection hub was installed nor does it exist;

iv. Despite the unequivocal language of the 2005 Bond Agreement, Smolka secured the execution of 15 contracts signed by owners of **vacant lots;**

v. Carollo Engineers prepared a fiscal study in the August 2002 Environmental Assessment Report based upon the premise that **all** vacant and developed property within the extended service area to the east and west of the existing Emigration Oaks water system would be charged a flat fee;

vi. In the aforementioned report, Carollo maintained that federally-backed funds would not be used to cure deficiencies of the Emigration Oaks water system acquired in the Boyer Agreement even though the two new service areas were to be connected the immediate east and west sides of Emigration Oaks;

vii. Between September 10, 2002 and May 3, 2005 Smolka executed firm commitment contracts for vacant lots with Creamer, developer Walter Plumb as well as various members of the ECCC and ETPC member Andrew McNiel ("***McNiel***"). Actual payment was never received from Creamer, while payment from McNeil was reimbursed on June 13, 2002;

viii. In the aforementioned Environmental Assessment Report, EID submitted a "Technical Memorandum" dated June 18, 2001 prepared by BIWC, which, upon information and belief, relied upon a study which did not exist or did not provide the necessary data to support federally-backed funding of the project;

ix. In the Environmental Assessment Report prepared by Carollo Engineers in August 2002, EID falsely represented that many private wells in the service area were contaminated with coliform bacteria, however, upon inquiry from EID Trustee Bowen, Mr. Wild of DDW clarified that only one well was contaminated with coliform bacteria; and

x. EID falsely represented in the Environmental Assessment Report completed by Carollo Engineers in August 2002 that the 67 "households" within the new service area were on **individual wells** when a substantial portion of the households were part of exclusive private urban developments supplied with water from the collective systems of the Meyer, Little Oaks, Quad I and II, and Mud Hallow wells, or were vacant lots with no well at all.

64. Having inferior water rights and in furtherance of the Agreements to acquire and then divert federally-backed funds and in furtherance of the **Creamer** and **Gillmor and Nuescheler Agreements**, the following occurred:

a. As part of the federally-backed loan proceeds from the 2005 Bond Agreement, in 2001, Carollo Engineers and BIWC completed an extensive "Master Plan" for a Canyon-wide water system, which included engineering and hydrological study for a

3.3-mile water line and an additional large, commercial well to be located in the so-called "Nugget formation" of the Canyon;

b. On September 15, 2006, EID secured another commitment of funds from the State of Utah for amount of $2,860,000.00 million ("***2007 Bond Agreement***") for the purpose of breaking ground for the aforementioned 3.3 mile water line along Emigration Canyon Road;

c. The 2007 Bond Agreement was contingent upon **175** executed, firm commitment contracts from Emigration Canyon households to include **175** negotiable instruments drawn for the amount of $750.00;

d. EID through, Smolka, Hughes, Bradford, Stevens and Carollo Engineers again made numerous false and misleading statements as alleged in paragraph 63 (h);

e. In addition, EID through Smolka sent letters dated July 13, 2006 to Canyon residents who owned superior water rights maintaining that some "previous owner" had "leased water rights from EID" and therefore the current resident was "contractually obligated to join the water system";

f. The aforementioned "lease contract" was identical to both the "stand-by" and "firm commitment" contract even if it actually had been executed by the previous property owner;

g. During this timeframe, EID required that Canyon residents fill private wells with sand before connecting to water service provided by EID;

h. Upon information and belief, in the year 2007, EID, through Smolka, created "dummy accounts" under which payments were received from actual Canyon residents known personally by the Relator and then "refunded" after final closing of the 2007 Bond Agreement;

i. On December 18, 2007, EID, through Smolka, collected $6,100.00 from a Canyon resident personally known to the Relator under a "stand-by" agreement, even though

the impact fee of $6,100.00 was only due upon actual connection to EID's water system according to EID meeting minutes;

j. On April 10, 2008, Smolka recorded that the above amount was refunded to the Canyon resident when it was not;

k. Since 2007, EID through Smolka has collected over $26,000.00 from a Canyon property owner personally known to the Relator in order for EID to extend a special "water-connection hub" for four (4) "stand-by" connections.

l. EID through Smolka, declined to present a written contract to the Canyon resident memorializing the verbal agreement.

m. No such connection hub was installed nor does it exist.

n. On July 10, 2006, EID, through Bradford, assured residents that development in Canyon would not be affected by the proposed extension to the water system, due to the fact that the "work of several citizxens [sic] in the canyon has resulted in zoning regulations that provide a much better tool for holding development to reasonable levels, so that we can properly manage the canyon's scarce resources";

o. In an undated correspondence sent to Canyon residents in 2006, EID through Smolka and Hughes denied that the development within the Canyon would "increase" due to the fact that the trustees and manager of EID are of the view "that properties in the canyon that could be eligible for building permits have either been built on [sic] whether this water line is installed or not."

p. Under the terms of the 2005 and 2007 Bond Agreements requiring a minimum of **232** existing Canyon households to connect to the EID water system once funded and operational (**57** + **175**), only **35** families have relinquished water rights to EID upon actual connection as reported to the Utah State Engineer's Office to date.

q. On October 11, 2012, EID secured another commitment of funds in the amount of $1,600,000.00 from DDW in order to construct the aforementioned large commercial well (Upper Twin Creek Well) ("***2013 Bond Agreement***") as envisioned in the

Master Plan completed with federally-backed funds secured in the 2005 Bond Agreement;

r. EID determined that the purposed well would be located on the west side of the aforementioned property previously owned by Gillmor(s) and approximately 1/2 mile directly north of the existing Twin Creek Well (Boyer Well #3), which, at that time, was only producing at 25% of its rated capacity;

s. Sometime prior to October 8, 2013, EID purchased a 20-acre parcel for the Upper Twin Well from developer Walt Plumb for $140,000.00 – an amount well above what developer Plumb expected to receive for a property without water rights and well above the appraised market value;

t. EID failed to have the value of property appraised before closing;

u. Meeting minutes prepared by EID failed to record the terms of the agreement or the title transfer;

v. The 2013 Bond Agreement did not grant EID the use of loan proceeds for the purchase of property.

w. Contrary to the hydrology study and Master Plan completed with federally-backed fund in 2001 by BIWC, in a letter dated April 19, 2013, Smolka stated that the well-site was chosen because EID was mindful of the Freeze Creek walking trail and EID had "stayed as far away from the trail as possible with the road to keep this treasure as pristine as possible";

x. Both the aforementioned trail and well site are currently protected by no less than 6 no-trespassing signs warning of "criminal prosecution to the fullest extent of the law";

y. EID made no effort to obtain an easement from Salt Lake City although the actual well site of the Upper Freeze Creek well is located within 10 feet of property belonging to the city;

z. Monitoring wells were not installed during the selection of the Upper Freeze Creek Well. BIWC, through Don Barnett, informed a Canyon resident in June 2014 that he had wanted to install monitoring wells but he had been "admonished" by Smolka, Hughes, Stevens and Bradford for making such a suggestion and thus dropped the issue.

aa. Relator is informed and believes that no hydrological mapping or monitoring of water levels from production wells was completed by BIWC.

bb. In a letter from August 6, 2013 Smolka, Hughes, Bradford and Stevens reported that EID had spent (i) "years of due diligence, research and preparing a master plan," (ii) EID had hired "professionals, a hydrologist, a geologist, and engineers to assure the best possible plan and to implement the current system expansion," (iii) EID had decided that a new well was quickly needed and (iv) EID had gone "through a long and arduous process of deciding to add the new well, where to locate it and all the resulting detail";

- Organizational minutes reveal that BIWC first recommended a new well on April 19, 2012 – a mere six months prior to the 2012 Bond Agreement;
- On November 17, 2011, a mere six months prior to Don Barnett's aforementioned remark, Creamer inquired if EID had "any written information regarding what water sources the EID [sic] is looking at [sic]";
- No hydrological data or study supported the placement of the new well on the property previously owned by developer Plumb;
- The Upper Twin Creek well site is located 2 miles from the planned "Nugget Formation Well" as provided in the aforementioned Master Plan completed with federally-backed funds in under the 2005 Bond Agreement;

cc. Upon inquiry as to the reason for the inflated purchase price of $140,000 by a Canyon resident on March 14, 2014, Hughes responded that EID "didn't like dealing with

easement issues" and if EID did not purchase the property, developer Plumb would be "put under pressure to develop the property";

dd. Before the Upper Twin Creek Well was operational, on October 8, 2013, EID, transferred title to Creamer.

## IX. SECOND CAUSE OF ACTION UNDER 31 U.S.C. §3729(A)(1) – FRAUDULENT DIVERSION OF FEDERALLY BACKED FUNDS

(False Claim Act – Presentation of False Claims)

(31 U.S.C. § 3729 (a)(1))

65. Relator incorporates herein each of the allegations set forth above.

66. Having acquired over $6,306,000.00 of federally-backed funds and in furtherance of the **Creamer Agreement**, the following occurred:

a. Although a 1 million-gallon reservoir was to be constructed on flat ground between two hilltops to the north and south on property belonging to Salt Lake City, Creamer personally supervised the excavation of a 40-foot cut into the south hilltop in order to place the reservoir on his property;

b. Although EID had rendered payment to Salt Lake City on August 30, 2001 in the amount of $14,500.00 for a permanent easement as required by the 2005 Bond Agreement, the aforementioned property belonging to Salt Lake City remains undisturbed to date;

c. When surveying the boundaries of the Salt Lake City property in August 2002, Carollo Engineers, failed to place permanent markers on the site and failed to register the survey with Salt Lake County contrary to applicable state law (a Class B Misdemeanor);

d. Despite having received $14,500.00 on behalf of Salt Lake City for an permanent easement for the placement of the proposed 1-million gallon reservoir, Salt Lake City did not record the aforementioned easement with Salt Lake County;

e. Although construction drawings provided for a 1-million gallon tank at 71 foot in diameter and 31 foot in height, under supervision of Carollo Engineers, ABCO Construction Inc. -- upon information and belief a company owned or controlled by Creamer -- completed a 100-foot diameter tank at a height of 31 feet, which yields a capacity of 2 million gallons;

f. Contrary to the actual construction of the reservoir, construction specifications completed by Carollo Engineers provided for an above-ground tank located on relatively flat ground;

g. Although hired by EID sometime prior to October 9, 2003 to inspect and supervise the construction of the tank, Carollo Engineers failed to correct or report the aforementioned to the Government;

h. EID, through Smolka, Hughes and Hales, failed to record the easements required under the 2005 Bond Agreement on the aforementioned property with Salt Lake County thereby concealing the diversion of federally-backed funds;

i. Upon information and belief, between September 2002 and May 2005, EID, through Smolka, diverted an unknown portion of federal funds in order to purchase and construct an unknown number of fire hydrants and individual water meters on Creamer's aforementioned vacant property previously owned by Gillmor(s);

j. To date, both the 2-million gallon reservoir and Brigham Fork Well may only be accessed through a 12-foot, French style, steel gate owned and controlled exclusively by Creamer;

k. During construction of the 2-milllion gallon reservoir, on November 19 2002, EID contracted with Creamer to construct an 8-inch water supply line between the reservoir, the Brigham Fork Well and the existing water system in Emigration Oaks to the west of the reservoir;

l. EID failed to contract with licensed engineers to inspect the work performed by Creamer and failed to inform Salt Lake County that construction of the water-supply lines by Creamer would not be inspected by a licensed engineer;

m. Rather than construct an 8-inch water-supply line, sometime in the year 2004, Creamer placed an 12-inch line through the property previously belonging to Gillmor(s) and hastily covered the trench; and by doing so, Creamer actively concealed the diversion of federally-backed funds;

n. After receipt of federally-backed funds administered under the 2005 Bond Agreement, Smolka reimbursed $119,652.33 to Creamer for the construction of the Brigham Fork Well (contrary to the 2005 Bond Agreement, which did not provide for funds to be used for a well);

o. During construction of the Upper Twin Creek Well in 2013, EID diverted funds in order to increase the capacity of the existing 300,000 gallon reservoir owned by EID to 750,000 gallons and retrofitted an additional t-valve diverter in order to supply water service to the immediate north for the sole benefit of Creamer;

p. Meeting minutes prepared by EID failed to record the additional water-system changes;

q. Upon information and belief, Creamer and/or EID covered the 1-ton, t-valve-diverter with a manhole cover labeled "**SEWAGE**" in order to conceal the actual purpose of bringing water service to Creamer's property to the immediate north via a 12-inch, water supply pipe and connection flange;

r. During construction of the water and electrical supply lines, EID and/or Creamer installed four water and electrical connection hubs, thereby allowing unhindered sale of later parceled lots as "buildable";

s. During the organizational meeting on March 12, 2015, Hawkes cited construction cost of the Upper Twin Creek Well at $2,069,615.00.

67. Having acquired over $6,306,000.00 of federally-backed funds and in furtherance of the **Gillmor Agreement**, the following occurred:

a. Sometime in the year 2007, during completion of the water-supply line along the main-Canyon road, EID constructed an additional 1 mile of water-supply lines through an independent water system (Spring Glen Water Company) to include four fire hydrants and 17 individual water connections;

b. The diameter of water supply line at 8 inches far exceed the capacity needed for 17 potential water users but is believed to be intended to provide water service to Gillmor(s)' future development of 130 acres;

c. EID situated its fire hydrants between 2 and 20 feet of the existing fire hydrants belonging to the Spring Glen Water Company;

d. Despite the enormous cost of adding 1 mile of supply lines and 4 fire hydrants, of the 17 households connected to the Spring Glen water system at that time, only Bradford, EID's Trustee, and Winger, an architect/builder, had requested water service from EID;

e. Sometime in 2007, Smolka waived the water-right lease fees for the benefit of Winger;

f. Sometime in 2003, Smolka waived the water-right lease fees for the benefit of Bradford.

g. On May 5, 2010, EID, through Smolka, charged one Canyon resident personally known to the Relator $6,000.00 for a "Water Right fee" even though a private water right was already attached to the property.

h. In January 2014, Larry Gillmor purchased an additional 47 acres above the Spring Glen Community;

i. To date, Gillmor(s) collectively own 172 acres of prime, developable land above the Spring Glen Community accessible from both Cedar Loaf and Skycrest Lanes;

j. Sometime in the year 2007, EID constructed two 8-inch water supply lines to the aforementioned 172 acres at both the Cedar Loaf and Skycrest Lanes at substantial cost;

k. Contrary to the Utah Open Meetings Law requiring proper notice and scheduling of public meetings, EID scheduled a "trustee work meeting" on January 12, 2015 to be held at the law office of EID's counsel the very next day at 3:00 pm; and

l. At the aforementioned meeting, Hughes, Bradford, Stevens, Smolka and Hawkes agreed to waive water connection and impact fees in order to induce the 17 residents of Spring Glen to relinquish their superior water rights to EID for the sole benefit of Gillmor(s).

68. Having acquired over $6,306,000.00 of federally-backed funds and in furtherance of the **Nuescheler Agreement**, the following occurred:

a. During construction of the main-canyon water line in the year 2007, EID, through Smolka, diverted funds in order to extend an 8-inch water supply line 1/4 mile up into the area known as "Little Mountain" to include placement of two fire hydrants at a cost of $4,000.00 each;

b. Despite the enormous cost of constructing water lines and fire hydrants, only two residents on private wells resided in the area of Little Mountain;

c. EID, through Smolka, waived impact fees to Little Mountain resident Troy Bierman in order for Troy Bierman to request water service from EID;

d. To date, the only other resident in the area of Little Mountain remains on a private well;

e. In the Master Plan from 2001 prepared by BIWC with federally-backed funds, EID did not indicate any intention to extend water service into the area of Little Mountain;

f. On April 28, 2013, Catherine Gillmor agreed to the sale of 59 acres of prime developable property to Nuescheler immediately adjacent to property belonging to Nuescheler thus providing the later with a total of 124.18 continuous acres;

g. In the EID Trustee meeting on March 12, 2015, Bradford insisted that the 8-inch, water supply line constructed in 2007 be extended another 1,200 feet in order to provide water service to Nuescheler's "single home";

h. When questioned as to the enormous costs of extending a water-service line to otherwise vacant property, Bradford insisted that "several" fire hydrants were needed for "fire protection" all along property belonging to Nuescheler; and

i. Bradford would "require" at least an 8-inch water-supply line before EID would provide water service to Nuescheler's "single home."

69. In order **to further perpetuate** the Agreements to divert federally backed funds, the following occurred:

a. On May 11, 2011, Hughes, Bradford and Stevens unanimously appointed Smolka as the EID "Election Specialist";

b. During the November 2013 EID-trustee election, Smolka and his spouse Marilyn Smolka inappropriately supported the re-election of Stevens by (i) encouraging voters during balloting to cast their vote for Stevens, even going so far as commenting, "thank-you for voting for Mark [Stevens]. He really needs your vote"; (ii) withholding ballots from Canyon residents antagonistic to the management of EID; (iii) improperly sending ballots outside of Emigration Canyon to non-existent mailing addresses; and (iv) improperly collecting and opening ballots prior to ballot counting by election judges;

c. Hughes, Bradford and Stevens agreed to compensate Smolka over $6,000.00 to conduct the trustee election despite the fact that the same service provided by Salt Lake County would have cost Canyon tax payers $1,594.60.

70. By means of the aforementioned perpetuation of the Agreements and active concealment of the diversion of federally backed funds, EID was noncompliant with its 2005, 2007 and 2013 Bond Agreements.

71. Had the Government been aware of the actual facts, federally-backed funds would have been immediately recoverable up until bond closing.

72. Under the terms of the 2005 Bond Agreement, the statute of limitation under the False Claim Act was triggered by the bond closing on May 3, 2005.

73. Having fraudulently acquired and then fraudulently diverted $6,306,000.00 in federally-backed funds, the Defendants secured the following **private profit** for themselves and the following participants:

    a. Of the six payments dispersed under the 2005 Bond Agreement, Smolka rendered payments for individual personal gain as follows:

        - $64,160.03 to himself,
        - $7,915.75 to Joe Smolka, a member of the ECCC, for unknown services,
        - $800.00 to Troy Bierman for unknown services,
        - $34,145.30 to Creamer, for placing water lines,
        - $400.00 to Tyson Creamer, for unknown services,
        - $1,140.00 to Hughes, EID Trustee, for "dirt bags" and "snow removal",

    b. Contrary to Utah state law forbidding nepotism as per Utah Code § 17A-1-201, EID trustees Hughes, Hales, Bradford and Stevens permitted Smolka to render payments on behalf of EID in excess of $150,000.00 to Smolka's wife, Marilyn Smolka, his brother Joe Smolka, his daughter Tanya Bergstrom, his son-in-law, son, grandson and a certain Gail Smolka since January 1, 2004;

    c. EID, through Smolka, leased water rights: (i) to Bradford sometime in 2002 in order for the same to obtain a building permit from Salt Lake County; (ii) to Creamer in sometime in 2013 in order to construct a large pond in front of his personal residence; (iii) to McNeil sometime in the year 2003 in order for the same to obtain a building permit from Salt Lake County; and (iv) to Jeff Bierman ("***Bierman***") former EID Operations Manger and ECCC member, thereby allowing the same to purchase property at a reduced price and then immediately obtain building permits from Salt Lake County with a water right leased from EID;

d. Relator is informed and believes that between 2004 to present, EID and Smolka waived impact and water usage fees for the personal benefit of Hughes, Bradford, Stevens, Creamer, Hawkes, McNeil, Bierman, Troy Bierman, and Jennifer Hawkes, current ECCC member;

e. In the Trustee meeting on March 12, 2015, EID confirmed Smolka's yearly compensation of $120,000.00 but still maintained that the administrative costs of EID were "negligible";

f. In its yearly budget since 2004, EID has designated payments to Carollo Engineers, BIWC, Aqua and Yonkee in excess of $1,000,000.00 for engineering and hydrological work;

g. When questioned why proposed projects were not being submitted to competitive bidding in December 2014, EID responded that EID prefers to work with people who "know Emigration Canyon";

h. On February 13, 2014, despite EID's financial inability to service its debt obligations, Hughes, Bradford and Stevens unanimously voted to increase their yearly compensation from $2,000.00 to $5,000.00;

i. During a Trustee meeting of EID on November 8, 2014, Hughes insisted that a new septic-system project be completed by his company Ecosens;

j. Hughes is not a licensed contractor;

k. On April 4, 2006, Ecosens was administratively dissolved due to Hughes failure to provide annual filing statements;

l. The yearly compensation of EID's "advisors" and "committee members" is unknown;

m. On December 12, 2013 the Canyon resident placed a GRAMA request with Hawkes for EID financial records. When the resident inquired as to the status of the request on January 29, 2014, EID's general manager posted a letter signed by Smolka on the door of the aforementioned Canyon resident threatening to

discontinue water service in two days, if the Canyon resident did not bring his account current with EID the very next day.

74. In order to **further perpetuate** the Agreements to misuse public funds for private profit, the following occurred:

a. EID, through Hughes, Hales, Bradford and Stevens, allowed Smolka unhindered financial control of EID despite the knowledge that during Smolka's tenure as president of the Utah company "Home Savings and Loan," the aforementioned company defrauded 71 homeowners and was found guilty of state and federal securities violations on August 15, 1984;

b. During Trustee "work meeting" on January 13, 2015, Smolka was confirmed as "EID Treasurer" despite the fact that all treasury duties had been assumed by Hawkes. When warned by EID's counsel as to "public push-back" for retaining Smolka as "EID Treasurer," Hughes responded that the issue didn't concern him because "there are only 5 people in the Canyon who even care what we do";

c. On June 3, 2010, Stevens, a general surgeon with no training as an accountant, reported that his "internal audit" of EID's financial records found no irregularities;

d. On May 11, 2011 EID's attorney opined that EID could not retire debt with general property taxes;

e. Despite this unequivocal legal opinion, on July 7, 2011, EID, through Bradford and Hughes, approved a "loan" of $135,000.00 from the "General Fund" to the "Emigration Oaks Fund";

f. On December 6, 2012, EID combined the Emigration Oaks and General accounts; and

g. In the Trustee meeting from March 12, 2015, Stevens revealed that revenue from general property taxes was being used to service EID's debt obligations.

75. In order to further perpetuate the Agreements to increase the value of property owned by EID, Creamer, Gillmor(s) and Nuescheler by **displacing low-income residents via predatory fees and taxes**, the following occurred:

a. To date, Salt Lake City charges an impact fee of $3,000.00 for new residential construction located within the limits of Salt Lake City;

b. Shortly after obtaining funds from the 2007 Bond Agreement, EID raised the water connection impact fee from $5,500.00 to $17,000.00 for all homeowners not "on stand-by";

c. A vote on or any discussion regarding the aforementioned impact-fee increase is not recorded in EID's meeting minutes;

d. Since 2007, EID has increased property taxes of Canyon property owners every year to the highest allowed by Utah State Law when such increase is authorized;

e. In the case of one Canyon owner of a vacant parcel, a property tax of $40.74 assessed for the tax year 2014 was increased to $290.90 due to the taxes and fees imposed by EID;

f. In order to purposely increase water usage fees, EID intentionally did not install pressure reducing valves despite numerous requests from Canyon residents in 2013;

g. In the case of one Canyon resident, pressure in excess of 130 psi was measured in April 2013, a level twice that of normal residential water pressure, which led to the rupture of a water tank and extensive water damage;

h. Upon information and belief, in 2007, EID intentionally installed pressure reducing valves on fire hydrant supply lines instead of domestic water connections in order to maintain high water pressure thereby increasing consumption rates and water usage fees;

i. Between May and August 2014, EID billed one Canyon resident twice the amount for water usage for the month of August 2014 even though actual consumption was the same for the month of May thereby billing the resident $2,521.00 for one single month;

j. Between May and August 2014, EID did not change its water rate fee schedule;

k. Contrary to Utah Law forbidding nepotism under Utah Code §17A-1-201, EID, through Hughes, Stevens and Bradford, approved Smolka's appointment of his daughter Bergstrom to conduct billings for EID from her personal residence in Loveland, Colorado;

l. EID's website is maintained by Bergstrom's husband;

m. On June 1, 2013, EID proposed raising "base" and "stand-by" fees by $25.00 per month to include a new monthly surcharge of $1,400.00 for excessive water use;

n. On that date, EID also proposed a "fire-hydrant-rental fee" of $15.00 per month to 86 households on private wells "who pay nothing" for the water service provided by EID;

o. All 17 residents of Spring Glen who already owned four fire hydrants in their community before EID installed 4 additional hydrants have all been charged a "fire-hydrant rental fee" of $15.00 per month since September 2013;

p. In June 2013, Joe Smolka, EID's Operations Manager, informed a Canyon resident that EID intended to raise the fire-hydrant rental fee to $50.00 per month "as soon as possible";

q. Despite the clear language of the correspondence from June 1, 2013 requiring fire-hydrant rental fee payments from "households", EID and Smolka levied fees not only for developed properties but also numerous vacant lots since September 2013;

r. In the period from September 2013 to September 2014, EID assessed a $520.00 fire-hydrant rental fee on vacant property belonging to a 86 year-old, widowed resident on a private well;

s. On November 14, 2013, 6 retired Canyon residents on fixed-monthly income requested relief from the fire-hydrant rental fees under Salt Lake County's "circuit breaker program" to EID;

t. EID refused to waive the fire-hydrant rental-fees;

u. Upon appeal by two Canyon residents of the "stand-by" and "fire-hydrant rental" fees to EID on November 14, 2004, Hughes replied that if Canyon residents "didn't like EID fees, they were welcome to move out of Emigration Canyon";

v. During the aforementioned secret meeting held on January 13, 2015 at the office of EID's counsel, Bradford implied that Canyon residents residing in the main canyon were "second-class citizens" and Hughes commented that the area was "the ghetto". Hughes

summed up his opinion of the constituents who had elected him as EID trustee with the analogy that "if they were giving out gold in Emigration Canyon, they [the Canyon residents] would complain about the color";

w. On February 6, 2003, a Canyon resident informed EID that the water rates charged by EID was twice that of Salt Lake City;

x. In September 2014, under Salt Lake County's "certified delinquent program," established by the Utah State Legislature for the benefit of Utah Special Districts, EID through Hawkes, certified 48 property owners as delinquent in fire-hydrant-rental and stand-by fees to EID, thereby substantially increasing the 2014 property taxes of many Canyon property owners;

y. EID, through Hawkes, certified a single, vacant parcel belonging to a 86-year old, widowed Canyon resident to Salt Lake County for the amount of $520.00;

z. In the year 2013, EID certified only 3 property owners as delinquent to Salt Lake County;

aa. Those Canyon residents with escrow accounts managed by mortgage lenders were unable to prevent payment of the fire-hydrant rental fees accessed by EID through the certified delinquent program.

bb. Relator is informed and believes that over 50 complaints have been made to Salt Lake County concerning the activities of EID since June 2013.

76. In order to further perpetuate the EID Agreement to increase the commercial value of property owned by EID, Creamer, Gillmor(s) and Nuescheler and **hinder other property development** in the Canyon, the Defendants caused the following to occur:

a. Sometime prior to July 2, 2009, a private investor approached EID with plans to develop a property in Emigration Canyon known as "Skycrest Ranch.";

b. EID, through Hughes, informed the developer that EID had "a master plan that designates specific numbers of connections for certain areas, and they have to work within that plan";

c. Hughes stated that there existed certain "pressure problems related to putting a large development on the water system in that area" despite the fact that no such master plan or pressure problem existed;

d. Hughes is not an licensed engineer nor a member of EID's "Engineering Committee."

e. On December 19, 2002, EID instructed Don Barnett to prepare a hydrology report for a remuneration of $1,500.00 supporting the effort of Utah Open Land's attempt to acquire a conservation easement of all property owned by Salt Lake City in Emigration Canyon;

f. In November 2005, 190 acres immediately west of the Spring Glen Community appraised at $2,400,000.00 known as "Perkins Flats" was purchased by Utah Open Lands for $1,400,000.00;

g. Among other donors, Envirocare Environmental Foundation, a company owned and controlled by Creamer, contributed an unknown amount to the cost of removing the entire area from future development;

h. In the year 2011, 265 acres located in upper Killyons Canyon area was purchased and then donated to Utah Open Lands at a reduced cost of $1,800,000.00; and

i. Relator is informed and believes that the anonymous donor who contributed $500,000.00 toward the purchase price was Creamer.

77. To date, EID, Creamer, Gillmor(s) and Nuescheler own and control the only large parcels of developable property with access to water service provided by EID.

## X. THIRD CAUSE OF ACTION UNDER 31 U.S.C. §3729(A)(1) – VIOLATION OF THE CLEAN WATER ACT (FAILURE TO REPORT THE DISPOSAL OF CONSTRUCTION WASTE ON A FEDERALLY-FUNDED BUILDING SITE)

(False Claim Act – Presentation of False Claims)

(31 U.S.C. § 3729 (a)(1))

78. Relator incorporates herein each of the allegations set forth above.

79. Under the terms of the 2005 Bond Agreement, EID assumed the contractual obligation to comply with all provisions of the Clean Water Act.

80. Despite the aforementioned obligation, the Defendants failed to report the following:

a. Due to the substantial divergence from the original design and placement of the 2-million-gallon reservoir constructed under the 2005 Bond Agreement, the reservoir's structure proved deficient and immediately began leaking water after it became operational sometime before October 2003;

b. After a Canyon resident informed DDW that the structure was leaking sometime before October 23, 2003, Creamer immediately covered the entire structure with large amounts of construction debris including petroleum asphalt waste;

c. When demanded by EID Trustee Bowen to discontinue dumping hazardous material on the construction site sometime prior to October 23, 2003, Creamer simply ignored EID Trustee Bowen;

d. Upon complaint by a Canyon resident of the waste disposal sometime prior to October 9, 2003, DDW demanded that it be allowed to observe waste removal and clean-up;

e. On November 13, 2003, EID, through Smolka, ignored the aforementioned demand of DDW and simply informed Hales and Hughes that Creamer "and five other people spent five hours cleaning asphalt out of the fill and that they did a thorough job."

f. Creamer willfully concealed the reservoir's structural deficiency, its actual location and excess capacity by covering the same with petroleum asphalt waste under a thin layer of seeded top-soil; and

g. A Canyon resident even informed EID, Smolka, Hughes and Hales in October 2003 that Creamer had chosen the incorrect seed mix under the 2005 Bond Agreement for the purpose of re-vegetation.

81. Since October 2003, the aforementioned Defendants have actively avoided the assessment of fines in violation of the Clean Water Act.

## XI. FOURTH CAUSE OF ACTION UNDER 31 U.S.C. §3729(A)(1) – VIOLATION OF THE CLEAN WATER ACT (FAILURE TO REPORT THE DISPOSAL OF WASTE IN THE EMIGRATION CANYON CREEK)

(False Claim Act – Presentation of False Claims)

(31 U.S.C. § 3729 (a)(1))

82. Relator incorporates herein each of the allegations set forth above.

83. Despite EID's obligation to comply with the provisions of the Clean Water Act as stipulated in the 2005 Bond Agreement, the Defendants failed to report the following:

   a. During construction of the Emigration stream crossing sometime prior to October 23, 2003, Creamer disposed of construction waste including paper products directly in the Emigration Canyon Creek.

   b. Creamer willfully concealed the disposal of construction waste in Emigration Canyon creek by hiding debris under concrete encasements.

   c. The aforementioned debris was discovered by Mr. Wilde of DDW when investigating a complaint of improper construction techniques around the federally-protected water way.

   d. Despite complaints from a Canyon residents directly to Smolka, Hughes and Hales, EID failed to record the violation in the meeting minutes.

84. EID, Smolka, Creamer, Hughes and Hales actively concealed the disposal of construction waste by Creamer and thus avoided the assessment of fines otherwise imposed by the Government.

## XII. FIFTH CAUSE OF ACTION UNDER 31 U.S.C. §3729(A)(1) – VIOLATION OF THE CLEAN WATER ACT (FAILURE TO REPORT CONTAMINATION OF DRINKING WATER)

(False Claim Act – Presentation of False Claims)

(31 U.S.C. § 3729 (a)(1))

85. Relator incorporates herein each of the allegations set forth above.

86. Despite EID's obligation to report contamination of the drinking water delivered to Canyon residents to the Government under the 2005 Bond Agreement, the following occurred:

   a. Due to the placement of the Brigham Fork Well on property previously owned by Gillmor(s) and currently owned by Creamer without sufficient hydrological study, the well pump began pulling gravel into the system sometime prior to August 2012;

b. During the EID Trustee meeting on March 12, 2015, Hawkes revealed that the Brigham Fork well was pumping three times a week into the system despite the fact that it was contaminated with iron bacteria;

c. A Canyon resident inquired as to when the "well-casing problem" would be corrected;

d. Bradford and Don Barnett responded that they wanted to wait until after the summer months to correct the problem;

e. EID, through Bradford, stated that the Brigham Fork well was needed in the up-coming summer months in "case of an emergency";

f. In a prior correspondence on June 4, 2014 to all Canyon residents, EID maintained that EID was "supplying high quality water tested three times a week";

g. EID, Aqua, Smolka, Hughes, Stevens, Bradford, Rodgers, Neely and Rasmussen failed to report bacterial contamination of the drinking water provided by EID to the Government;

h. During the aforementioned meeting on March 12, 2015, two Canyon residents reported that they disliked the taste of EID water and preferred to stay on their own private wells; and

87. EID, Aqua, Smolka, Hughes, Stevens, Bradford and Hawkes have thereby actively avoided the assessment of fines in violation of the Clean Water Act due to the failure to report bacterial contamination sometime prior to August 2012, to 273 households.

## XIII. SIXTH CAUSE OF ACTION UNDER 31 U.S.C. §3729(A)(1) – VIOLATION OF THE CLEAN WATER ACT (FAILURE TO REPORT THE DISCHARGE OF CONTAMINATED WATER)

(False Claim Act – Presentation of False Claims)

(31 U.S.C. § 3729 (a)(1))

88. Relator incorporates herein each of the allegations set forth above.

89. Despite EID's obligation to comply with the provisions of the Clean Water Act, as stipulated under the 2005 Bond Agreement, the following occurred:

a. Due to the substantial divergence from the original design and placement of the 2-million-gallon reservoir constructed under the 2005 Bond Agreement, the tank's structure proved deficient and immediately began leaking water after it became operational sometime before October 2003;

b. After a Canyon resident informed DDW that the structure was leaking sometime before October 23, 2003, Creamer immediately covered the entire structure with large amounts of construction debris including petroleum asphalt waste under a thin layer of seeded top soil;

c. Construction documents prepared by Carollo Engineers provided for an-above ground tank; and

d. During the site inspection, Carollo Engineers failed to report the discharge of water from the tank or the substantial divergence from the construction drawings presented to the Government at the time of bond closing on May 3, 2005.

90. Since October 2003, EID, Smolka, Hughes, Hales Creamer and Carollo Engineers have actively avoided the assessment of fines in violation of the Clean Water Act by failing to report the discharge of contaminated water in the Canyon.

## XIV. SEVENTH CAUSE OF ACTION UNDER 31 U.S.C. §3729(A)(1) – VIOLATION OF THE CLEAN WATER ACT (FAILURE TO REPORT THE IMPAIRMENT AND RETIREMENT OF SUPERIOR WATER RIGHTS)

(False Claim Act – Presentation of False Claims)

(31 U.S.C. § 3729 (a)(1))

91. Relator incorporates herein each of the allegations set forth above.

92. Despite EID's obligation to comply with the provisions of the Clean Water Act as stipulated in the 2005 Bond Agreement, the following occurred:

a. Sometime in 1988, BIWC acquired 649 acre feet of surface water rights from Emigration Dam and Ditch Company for the benefit of EID (57-7796);

b. On August 3, 1993, EID through BIWC submitted a permanent change application under the designation "a17521" to the Utah Division of Water Rights in order to

"develop an adequate water supply for canyon residents" despite the fact that most all Canyon residents at that time were on private-wells;

c. The aforementioned application was approved on December 14, 1995;

d. With over 583 households located within the Canyon possessing superior water rights, EID failed to report to the government at the time of the 2005 Bond Agreement closing on May 3, 2005 that a single impairment of one private well with an earlier priority date carried the risk of complete forfeiture of water service and total loss of federally-backed funds under the applicable Utah State Water laws;

e. Since 2014, several Canyon residents personally known to the Relator have reported substantial decrease in the productivity of their private wells; and

f. During the EID trustee meeting of March 12, 2015, EID reported that the Emigration Creek was down 50% of its normal flow due to high-water consumption within the area of Emigration Oaks.

93. In furtherance of the BIWC Agreement to **retire superior water rights** and **acquire additional water shares** for the sole benefit of Creamer, Gillmor and Nuescheler the following occurred:

a. In 2007, EID through Smolka informed a single-mother during the purchase of a home located within the Canyon on that she would forfeit her "leased" water right from EID if she did not sign a "stand-by contract" and render immediate payment of $750.00 prior to closing of the home purchase.

b. Fearing that she would be without water from her private well, the Canyon resident rendered full payment as well as monthly payments of $40.00 per quarter until 2012.

c. During the sale of the aforementioned property in 2012, EID informed the aforementioned Canyon resident, that she would have discontinue use of her private well as stipulated under the express terms of the "stand-by contract."

d. After placing a lien on the residence shortly prior to closing, the impact fee for connecting to the EID water system of $6,250.00 was collected from the escrow account of the title company upon closing.

e. Relator is informed and believes that no such lease contract exists.

f. A search of the Utah Division of Water Rights records reveals that the aforementioned Canyon resident possessed a superior water right to that owned by EID since March 16, 1998 with a priority date of February 1963.

i. Sometime prior to March 12, 2015, EID informed 8 Canyon residents that they had “leased” water rights from EID and were therefore contractually obligated under the “lease contract” to discontinue use of their private well and connect to the EID water system.

j. During the Trustee meeting from March 12, 2015 Stevens and Bradford ordered EID’s counsel to enforce the aforementioned “lease contracts.”

g. Examination of the aforementioned contracts revealed that “lease contracts” were identical to both “stand-by” and “firm-commitment” contracts being enforced by EID;s legal representative.

h. Although the State of Utah requires 0.45 acre feet for one domestic household use, Canyon residents were informed since 2006 that 0.75 acre feet would have to be relinquished to EID when connecting to the municipal water system.

i. Review of the water rights deeded to EID between 2002 to present reveals that some Canyon residents relinquished no water rights upon connection to the EID water system (Winger, Bradford, Bierman and McNeil) while others released 0.45 acre feet (Smolka) while many others relinquished 0.75 as well as 0.8, 0.9 acre feet, and even 1.21 acre feet.

j. Relator is informed and believes that the amount of water right demanded released to EID depended up the Canyon resident’s outward appearance of age, sex, education

level, marital and financial status whereby the most vulnerable residents were especially susceptible to excessive demands.

k. On December 13, 2013, EID through Barnett failed to prevent the permanent change application for 94.04 acre feet supplying water to 188 families from lapsing (a12710b).

l. Having failed to file a timely extension to the aforementioned water right, all 188 families supplied with water from EID now have a priority date of January 30, 2014.

m. As such, any impairment of a water right established prior to that date, will lead to discontinuance of water service to all 188 homes should one, single homeowner with superior water rights bring legal action against EID.

n. Relator is informed and believes that EID willfully allowed the aforementioned permanent-change application to lapse in order to grant a higher water right priority for the remaining 649 acre feet to be utilized for the planned development of property belonging to Creamer, Gillmor(s) and Neuscheler.

o. Since 2014, several Canyon residents personally known to the Relator have reported substantial decrease in the productivity of their private wells.

p. During the EID trustee meeting of March 12, 2015, EID reported that the Emigration Creek was down 50% of its normal flow due to high-water consumption within the area of Emigration Oaks.

94. Since March 2015, EID, Smolka, Hughes, Stevens, Bradford, and Hawkes have actively avoided the assessment of fines in violation of the Clean Water Act for the willful retirement and impairment and of superior property rights to a clean, safe and reliable water supply.

## XV. SUMMARY OF ALLEGATIONS UNDER THE FALSE CLAIM ACT

95. Relator incorporates herein each of the allegations set forth above.

96. The purpose of the Boyer, Creamer, Gillmor, Neuscheler, EID and BIWC Agreements described in the preceding paragraphs was to render real properties owned by EID, Creamer,

Gillmor(s) and Nuescheler readily developable and therefore substantially increased their commercial value even without actual transfer of title to an innocent third party.

97. By failing to report the aforementioned violations of the Clean Water Act, the Defendants have actively prevented the assessment of fines by the Government.

98. Each subsequent acquisition and diversion of funds under the 2007 and 2012 Bond Agreements was a factual execution of Defendant's original Agreement to fraudulently acquire and fraudulently divert federally-backed funds secured under the 2005 Bond Agreement.

99. All engineering and hydrological work for the subsequent construction of the main-canyon water line (funded under the 2007 Bond Agreement) and additional large, commercial well (funded under the 2012 Bond Agreement) was paid with federally-backed funds distributed under the 2005 Bond Agreement.

100. Public funds secured under the 2007 and 2012 Bond Agreements are therefore subject to the provisions of the False Claim Act in their entirety.

101. By fraudulent acquiring, and then fraudulently diverting, $6,306,000.00 of federally-backed funds to increase the commercial value of property owned by EID, Creamer, Gillmor(s) and Nuescheler, EID rendered its bond-agreement covenants from 2005, 2007 and 2012 false. Indeed, as EID planned this use of funds at the time it obtained them from the United States, these statements were false when made.

102. To date, EID, Creamer, Gillmor(s) and Nuescheler own collectively over **900** acres of prime developable property in Emigration Canyon now serviced by two reservoirs with a combined capacity of 2,750,00 gallons including five commercial wells and over 12 miles of oversized water-supply lines.

103. Sometime prior to January 2015, EID discontinued the use of Boyer Wells #1 and #2 for reasons unknown and unreported in the organizational meeting minutes.

104. As 0.45 acre feet are currently required by the Utah State Engineer's Office for each domestic unit, EID owns 1,426 additional shares of water rights within the Canyon above its current 233 reported domestic units.

105. To date, EID has the legal and technical capacity to provide water service to an additional **710** new households within the aforementioned future-service areas owned by EID, Creamer, Gillmor(s) and Nuescheler.

106. In the Trustee meeting from March 12, 2015, Hawkes revealed a formula whereby EID would collect increased impact fees from an additional **517** new homes "yet to be constructed" in the Canyon.

107. A vacant property of 1.4 acres currently located in Emigration Oaks adjacent to Creamer's properties is listed at a market price of $740,000.00.

108. The fraudulent acquisition and fraudulent diversion of $6,306,000.00 of federally-backed funds has increased the commercial value of the aforementioned real property owned by EID, Creamer, Gillmor(s) and Nuescheler in excess of **$500,000,000.00**.

109. By constructing a $6,306,000.00 water system based upon a deficient hydrologist report for only **233** current Canyon residents as reported to the Utah State Engineer's Office, EID has decreased the stream flow of Emigration Creek by 50% of its normal capacity as reported by Stevens in the Trustee meeting from March 12, 2015.

110. Several Canyon residents personally known to the Relator have conveyed that their private wells are substantially less productive since the Upper Freeze Creek Well commenced operation sometime prior to February 11, 2014.

111. In the Trustee meeting from March 12, 2015, Stevens reported that the Emigration Canyon Stream was the first site in the State of Utah identified with *e coli* bacterial contamination.

112. Relator is informed and believes that the environmental damage caused by Defendants' illegal disposal of waste and mismanagement of the Canyon ground-water resources is substantial and unprecedented in the State of Utah.

113. The precise amount of federal funds obtained via false claims as well as the profits derived therefrom will be proven at trial.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States of America, requests the Court enter the following relief:

114. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of 31 U.S.C. §3729 as well as a forfeiture of all unlawful proceeds.

115. That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act,

116. That Relator be awarded all costs of this action, including attorneys' fees and expenses and

117. That Relator and the United States of America recover such other and further relief as the Court deems just and proper.

Dated: May 1, 2015

Christensen and Jensen

By: /s/ Scot A. Boyd
Scot A. Boyd, Esq.
*Attorneys for Relator*
*Mark Christopher Tracy*